Good morning. Mr. Burke to call the next business meeting. 3-15-0099, consolidated with 3-15-0103 and 3-15-0104, Illinois Landowners Alliance, MFP, Illinois Agricultural Association, Commonwealth Education Company, Appellant by E. Glenn Rippey v. Illinois Commerce Commission, Appellee by Matthew Harvey, International Brotherhood of Electrical Workers, Wind and Wires, and Rock Island Clean Line, LLC, Appellee by Owen McBride. Mr. Rippey. Good morning, Your Honors. May it please the Court, my name is Glenn Rippey. I represent Commonwealth Edison. With me this morning are Laura Harmon and Charles Davis, representing the 80,000 members of the Illinois Agricultural Association, commonly known as the Farm Bureau, and William Shea and Jonathan Phillips representing the Illinois Landowners Alliance, approximately 300 landowners, 3,000 landowners, no, I had 300, all along the 121 miles of line that Rock Island proposes to construct as part of its 500-mile, up to 660-kv project. Those parties opposed the project both on public interest grounds and because Rock Island is not a public utility and had no business being granted public utility status, which ultimately includes the power to take their land. Rock Island, when it was declared a public utility a full year ago now, provided no utility service to anyone it did not commit to. No generators and no use customers had even signed up to take service on the line. While Rock Island marketed its project as green, the record showed that even the supposed Iowa wind generators that it was designed to serve were hypothetical. It had, and it has, no electric service assets, and it has never, including before the Commission, assumed any obligation to serve anyone, including any Illinois customer. RI pointedly does not even commit to constructing its own line. Far from being a public utility committed to public service, it is a thinly capitalized out-of-state entity set up to pursue this $2 billion project for private profit, only if that profit is sufficient to warrant the effort and there is financing adequate to fund it. RI tried to lever that merchant status as a reason to depart from the traditional application of public utility standards and certificate standards, but in so doing, the Commission legally erred. Rock Island was not entitled to a CPCN, and it was not entitled to authority to operate as a public utility. The record is large and the briefs are lengthy, and I will not repeat them. The two legal errors I highlighted are plain, however, and are exactly the type of unlawful administrative action that this Court can and should set right. The ILA and IAA, with me here today, made several other arguments, including that the project is not leased cost and that there are other risks to the public. Council are prepared to answer any questions about those additional arguments if you are honest to have them. Our presentation, however, will focus on those two legal errors. The special status of a public utility has been set out in Illinois law for more than a century. While they must serve Illinois customers and must own and use assets or franchises in order to provide specific types of service, including electricity, the Supreme Court has made clear in the seminal Mississippi River decision that there is much more to it than that. In the words of the Court, the purpose of this act, the Public Utilities Act, was to bring under public control property which was being applied to the public use. The essence of being a public utility is serving the public. Now, that does not mean that every utility must serve every person in Illinois, but it does mean pledging one's company and one's assets to provide public service and holding oneself out and committing that they will serve qualified customers on a non-discriminatory basis. Those obligations and commitments are not to be disposed of lightly or circumvented. The Public Utilities Act is one of the single largest pieces of legislation in the Illinois Consolidated Statute. It imposes numerous obligations on public utilities, including comprehensive regulation. It's not like a business license which grants a right but no obligations. It carries with it serious affirmative obligations, including who must be served, how they must be served, when they must be served, and at what rates and on what terms. And it is critical that only public utilities be allowed to act as public utilities. Are those rates cost-based? Typically, Your Honor, rates are cost-based. In this case, Rock Island would be primarily... Typically, in a public utility, the rates are cost-based. Yes. When you keep the cost low, it benefits the user. Correct. The consumer. In this case, and correct me if I'm wrong, it appears that there is a desire to keep costs low to increase profits for the investors. Am I mistaken? No, Your Honor, you're not. Okay, you can return to your argument. I just wanted to interrupt. Actually, if I can further respond, one of the other features of this project is that rates are also regulated by the Federal Energy Regulatory Commission. And, in fact, the commission and the appellees rely on the fact that there is something called an open season, which I'll talk about in a few minutes. For 25%. Up to 25%. It could potentially be more, but at least 25%. And a key feature of that open season is it's an auction, so that the people who get service are the people that can offer the most. It's not a traditional public utility where there's a rate that's based on cost. It's whoever pays the most gets served, which is a very un-utility-like concept. In any event, it is critical that only public utilities be allowed to act as public utilities because of the powers that come with that status. They include preferential access to public property and, ultimately, include the right to take private property, including of the people on this proposed line. Now, the – Have there been any easements purchased from landowners to date? I believe there have. Mr. McBride can probably answer that because it's been, as I said, a year since the record was closed. But – Were they taken by – No, there's no – Is it their domain? They're just private – None yet, Your Honor. Are they private contracts, then? They would be private contracts. Okay, all right. Once a public utility is set out in the statute, decisions of the Illinois Supreme Court, principally Mississippi River Fuel, and Century of Tradition. Section 8406A of the Act, however, requires that before a company can act as a public utility, it must get a certificate from the commission. That does not empower the commission to vary the requirements of being a public utility. It simply is a step that a utility must achieve in order to function as one. That is a pretty important step. It is a critical step because, as I said, public utilities have set powers. Now, I want to emphasize that under Illinois law, Rock Island did not need to become a public utility in order to try to build this line. You don't have to be a utility to try to build a line. But you do have to be a utility if you're going to try to exercise all of those state-granted powers, including ultimately the power to take property. Now, if you look at all the cases in the statute, they talk about a number of factors. I've created a little demonstrative. The demonstrative is not a brief. If it is at all an issue, it's not critical of the argument. But as you scour the cases, there are six things that are looked at. Are there assets? Are there utility assets? Are there customers served? Is the utility, the purported utility, providing service to customers? Is the type of service, a service enumerated in the Act, is a potential utility service? We'll call those the what-are-they-doing factors. And then there's factors about public use. Is there an obligation? Have they undertaken an obligation to serve the public? Secondly, have they undertaken an obligation to serve all qualified people, all the people that could properly come to them and demand service? And have they done it at non-discriminatory rates? Now, every Illinois utility, every Illinois utility other than Rock Island meets all six of those requirements. So how can you meet those requirements unless you're already a utility? It's not a catch-22, Your Honor. But every Illinois utility either already met them in the sense that, for example, when Commonwealth Edison or Ameren builds a new transmission line, they're already meeting them. Or they stood in the shoes of them. For example, ATC. ATC, American Transmission Company, acquired the assets of South Beloit Water, Gas, and Electric. They weren't a utility until the certificate was granted. But then they became one. Rock Island got a certificate a year ago. They haven't even filed the purported financing documents that are supposed to be filed in the future. They weren't a utility then. They aren't one now, and they didn't commit to ever be one. Critically, as we cited from the record in our briefs, Rock Island represented to the commission that it would not commit to ever even building a project, and, in fact, would only build the project in the words of its CFO if it could find adequate market financing. And that market financing would be dependent on whether or not the project made a good, profitable sense at some point in the future. That's not a public utility. When the statute refers to utility or public utility, can that definition or that reference point refer to a utility operating, for example, in Wisconsin? Or a utility operating in Iowa? Or a utility that's going to be accepting this power, I'm guessing, in Indiana? Is that where it's going to go? Actually, in theory, it's in Iowa. But one of the other things that's missing is the generators, the wind generators it's supposed to serve don't exist. So the utility could exist in another state and then apply for this permit to expand its business into Illinois. And, in fact, there are multi-state utilities. Amrum, before reorganization, had assets in Missouri as well as in Illinois. We have not argued, and there's no reason to believe, that it has to be only Illinois. So Rock Island is not operating as a utility any place in the United States? Nowhere in the world. Now, there's a Wings business, what, a parent company? There's a parent company that has – That operates in Wales? No, it has – actually, that's the parent. It's an investor in the parent, an investor that has only pledged a very limited amount of money. Any of those parent companies, would they qualify as utilities? Because as I'm reading all this, I'm asking, why isn't the parent company? That's a good question. But they don't have any assets here. The parent was very careful to simply – it's not, by the way, it's not the parent. Their parent is Cleanline, which is a utility nowhere. But an investor in the parent is National Grid, a very limited investor. I'm not – I believe the exact amount of money is subject to a protective order, but it's a few percent of the $2 billion that this project will require. That's the benefit of oral arguments. We get to, you know, ask these questions, and I apologize if I – Not at all. But the point is that in Mississippi River, there was assets, there were customers, and there was utility service. But because there was no pledge to serve the public, even that caused the Supreme Court to rule that it wasn't a utility. Here, there are no – none of the six characteristics apply, and again, there was no commitment, no promise, no pledge to ever have them apply. Now, let me briefly turn to the second point, which is they also got a certificate to build their project, and there are requirements set out in 846B of the Act that define when a certificate could be awarded. And a critical one is that the applicant be capable of financing the project without adverse impact to customers. There is no doubt from this record they are not capable of financing the project. If you roll in the resources of their parents, they can cover less than 2% of the cost of the project, and that parent has four other projects at least, maybe five, depending on how you count them. Moreover, they don't have any way to get the financing. What they've got is a vague hope or a plan for doing something in the future, and that's why the commission did something extraordinary, which is it said, we're going to give you a certificate now, even though we're going to require you to submit some materials to our staff, potentially years later – it's been a year, they've submitted nothing already – showing that you have an ability to finance this project. Requirements are requirements, and that requirement in the statute is absolute. It is written in the present tense, and there's not a shred of doubt in the record that it can't be met. The order doesn't find that it can be met. In fact, the order, by telling them that we're going to condition the exercise of certain – and this is critical, Your Honor – certain, but not all, powers of a public utility, on making a future submission to their staff. As it stood when the certificate was granted, and as it stands today, they do not have the capability of financing the project. There was a two-year limitation on this. There was a two-year limitation, Your Honor, on exercise of certificates. That gives our clients some pause, but not a great deal of comfort, because there is case law suggesting that a certificate can be exercised by as little as doing some soil borings or some surveying. So it's not like the certificate is going to evaporate in a year, and I invite you to ask counsel for the commission and or the appellees whether they think the certificate is going to disappear in a year. But it's been a year already, and they're still not capable of financing the project, in addition to failing all those criteria. Lastly is the problem of delegation. Not only did the applicant fail to demonstrate that it was capable of financing the project, even close to capable of financing the project at the time of application, but the commission's solution for that was to grant it a certificate now conditioned on a future submission. That future submission, however, is completely extra statutory. It's not a submission to the commission. It's a submission to the commission's staff. It's not going to create a proceeding that we have a right to intervene in or that any of my colleagues have a right to intervene in. It's not going to create a final order where the commission makes findings that we could potentially seek judicial review of. It's not a proceeding before the commission. It's a delegation to staff. There's at least three problems with that. One is the statute itself, 8406, requires the commission to make findings based on applicant's proof. There won't be. Secondly, Article 10 of the Public Utilities Act and Supreme Court precedent, including business and professional people in the public interest, make clear that the commission's decisions must be based on a proper record, and this will not be a proper record. It will be a submission to staff. And third, it puts the cart before the horse. As we said in the introduction to our brief, you don't grant a license to someone that doesn't qualify in the hope or the belief that years down the road they may retroactively qualify. You say to them, as the commission should have said to Rock Island, not yet, you have no assets, you have no customers, you make no commitment to serve, you have no ability to finance the project, come back when you do. We submit that because the commission did not do that, because it departed from precedent in the statute and found Rock Island to be a public utility now, when it didn't meet those requirements, and then approved a certificate for its project, moreover, when it could not finance that project. It committed legal error and compounded that legal error by unlawfully delegating the further disposition of the question of financing to its staff. For those reasons, we ask that the order be reversed and matter dismissed. Question? Your Honor? If I understand correctly, the power is going to come in from Iowa? That's the point. Across Illinois, and there's 121 miles that ends up in Grundy County. Twenty-five percent of that power, it's not being generated in Illinois, it's just passing through. In fact, the design of the line is such that it couldn't be generated. It's designed in such a way that it has to be an expressway with no intermediate stops. Are there any other public utility companies operating in Illinois that do not contribute power generated in Illinois and market three-quarters of the power that is crossing their lines to entities beyond Illinois? Is there any other utility company that does that? No. The closest would be ATC, which has a little piece. It's mostly a Wisconsin company. It purchased South Beloit Water, Gas, and Electric and a small sliver of assets from Wisconsin Power and Light. It serves, if recollection serves me, 40,000 customers total. It has no generation. Where are those customers located? In and around South Beloit, Illinois, and Roscoe and Rockton, and along a very small, thin strip at the northern border of the state. Then does the power go on past Illinois? No, it goes into Illinois. It ends in Illinois. South Beloit Water, Gas, and Electric, ATC, owns assets. They have obligations to serve customers here. They pledge those assets to serve customers here. They have rates that are not based on auctions. Okay, one more question. What happens if they get the permit to construct the line and then decide to build a facility in Indiana? What happens in that case? Well, they would have to apply in Indiana, and they have not. Either way, they also have to apply. But if they decide it's cheaper to do it someplace else? Then that permit is not exercised. The promise of these jobs that are much needed in Illinois is kind of an empty promise. What they really want is the line. I agree, and I want to emphasize, Your Honor, that there is no promise. They are very candid about the fact that they make no commitment to ever build this line unless they can get financing, and that financing is, in the words of their CFO, the market makes that financing attractive. You've answered my question, so you go. Okay. Thank you, Judge. Thank you, Mr. Rippin. Mr. Harvey, you'll be the first. Good morning, Your Honors. May it please the Court, Matthew L. Harvey. I'm a special assistant attorney general and representing the respondent Illinois Commerce Commission in this proceeding. I will present arguments on the question of whether Rock Island Clean Line LLC, which I will refer to as Rock Island, needed to be a public utility at the time of its application and whether it is properly a public utility now. Owen McBride, who is counsel for Rock Island, will present argument regarding whether the commission erred in determining that Rock Island is entitled to the certificate. Why is it called Rock Island? Does it pass through Rock Island Company? I believe so, Your Honor. I can't speak to the issues of why they named the company what they named it. But it sounds like a public utility because it has a public name. Well, we concur in that assessment, Your Honor. All right. Thank you. Yeah, the commission points out that I think it was Ameren that wasn't a public utility when they got their certificate. I believe it's a company called Ameren Transmission, which was at the time it sought public utility status. It had no public utility assets or, as nearly as can be determined, any assets, whatever. So that was a case where, indeed, the Congress Commission granted a certificate to an entity with no utility assets without demur. And it's certainly the commission's position that Section 8406 of the Public Utilities Act authorizes entities not currently certificated as public utilities. But that would have violated your opponent's rules about getting the certificate, correct? I wouldn't necessarily even call them rules, Your Honor. Perhaps more what my opponent believes to be the things that public utilities should do, or more accurately, what public utilities historically have been by counsel's estimation. The Catch-22, you referred to that in part to my earlier question. Do you have to be a public utility before you can get a certificate to be a public utility? Well, that is an excellent point, Your Honor. I mean, a Catch-22 is, based on the 1960 novel, a situation where contradictory rules prevent things from happening. And if you accept the construction of the statute that is being offered by the petitioners, that's exactly where it would be today. You would have to essentially violate the act to then own public utility assets to become a public utility and obtain a certificate of public convenience and assess it. But they make a point of saying that everything that was accepted by the commission here is really illusory, and it's not anything that in any way, shape, or form would be binding or obligatory. It's all wishful thinking if things all fall into place in the future. I think given the nature of the— Is that part of their argument? That's certainly what they contend, Your Honor. In light of—I think my colleague will probably speak in greater detail to that. But in light of the first impression nature of this project, the commission, I think, exercised its expertise in interpreting the statute, which doesn't entirely contemplate this kind of a project necessarily. It wasn't drafted with this in mind. What makes the first impression is that it's a merchant transmission, correct? I believe this is the first such project in Illinois. Tell me what a merchant transmission is. Well, a merchant transmission, as I understand it, Your Honor, is a transmission line that is constructed in a manner not funded by the ratepayers. And Mr. Rippey from Commonwealth Edison, I think, will concede that everything that Commonwealth Edison builds is funded by you and me and the ratepayers. They have a built-in sort of group of semi-investors, that being us because we all buy utility service from them. Now, what— And we're all interested in keeping costs low so that our rates are low. Well, and I think the General Assembly is also interested in clean power. I mean, if you look at Section 803—no, 803 or 804, I get the two confused. One's gas, one's electric. But the fact is that by a date certain, there will be a 25 percent renewable portfolio standard in this state. And clean power is how you do that. I mean, not necessarily wind power, but some other renewable resource like wind that will ultimately reduce prices and reduce greenhouse gases and be a net social benefit. So why do you think the merchant transmission qualifies as a public utility? Well, I think, first of all, they have— You know, Rock Island Clean Line, in this case, and I suppose I could talk more generally about merchant transmission, but— Go ahead. Your time is limited. In this case, Rock Island Clean Line has come in and said, we're going to build this project. We will make property available for some public use, up to 25 percent or more public use by people that want to use the facilities. How is that going to become available right now? It's being dumped into—going to be dumped into ComEd funds, right? Well, I think it will be placed on the grid generally. Commonwealth Edison owns a percentage of that, so certainly— And it doesn't require construction of that facility in Shanahan to do that? I don't believe so, but I'm not sure, A, that that's a matter of record, and, B, if you ask a lawyer an engineering question, you're likely to get a very inaccurate answer. So my concern is, where's the protection for all these wonderful jobs that we do need in Illinois? Because once they build the lines, what is their— what guarantee is there that they're going to build that facility they're promising in Shanahan and not take it someplace else? Because I think this power is going to the East Coast eventually, isn't it? Some of it no doubt will, Your Honor. I mean, the power grid is a big, interconnected, humming thing, with the exception of the state of Texas. So once it gets into the ComEd power grid, is it going to go elsewhere? Or is it going to stay in Illinois? I am not prepared to answer that right now. I don't think it's a matter of record. Some of it is probably going to get used in Illinois. Electrons are kind of fungible, so— That's why it's one minute. Well, in any case, I will just conclude right here. Well, I have a question for you. What about this two-year limitation? What's the reality there? I mean, is the Commission saying that if you don't act on financing fees within the two years, you have to come back and reapply? What are they saying? What is the contingency here? Well, as I read the statute, the certificate essentially goes away if not exercised in two years, and that's Section 8406 sub F of the Act. What constitutes an exercise of the certificate is an interesting factual question. I think probably making some material affirmative step to begin construction and undertaking that. This is not based on anything I've ever seen. The fact is that generally a company exercises its certificate in a timely way. Some of the smaller telecommunications companies have not exercised certificates. Well, in conclusion, Your Honor, I—Your Honor is plural, and I apologize. I urge you to affirm the Commission's decision in all of its particulars, and I thank you very much. I have one question before you step down, and that is under the 406A application process, in essence, the certificate in this case was granted to the application to meet all the other requirements for public utility. It's like a work in progress. Is that what the Commission did? I think the Commission did indeed assume that in the course of exercising its certificate, which it had two years from the date of its grant due, Rock Island Clean Line would accomplish a number of the things or all of the things that would give it the status. There were no standards about how much they had to accomplish. They had to accomplish something. Is that what the essence of it was? And in what areas of function were they applied to, if you don't mind my asking? I'm sorry, Your Honor, I'm not sure I fully understood that. Well, in the various requirements that there are to fulfill, some of them, at least, in the two-year period. I don't know, maybe I'm taking your question beyond what you intended. No, no, that's my intent. There are several areas that need to be achieved or should be achieved if you're going to become a utility. And maybe this is not a question you can answer, but how much needs to be achieved in any one area? My initial concern was financing, but there are obviously other things you just mentioned. What are the criteria here for the Commission to look at and say this is nothing or this is too small or this is sufficient? You know, Your Honor, this is, again, I think a good example of why we're all here today. This case is certainly unusual, bordering on unprecedented. And the fact is I think that my client, the Commission, will ultimately be charged with answering that question. If you were to ask me today, which you are, I would suggest to you that exercise of a certificate within the two-year period constitutes, would be, and this is what I would probably stand up on my feet and say before the Commission, some affirmative material act in furtherance of the construction of the facilities. I mean, I don't think there's an expectation that, let's say, they would complete construction of a complicated and substantial project within a two-year period. But I think, and again, I am speculating and not speaking for the Commission or any commissioner, I would expect that the Commission would expect to see something material to show for the certificate. That's the point of my question is when is enough enough? Your response is that the Commission, as the Commission, will then have to decide if there's enough in the Commission's eyes. But what is it in the certificate that was granted that contained the two-year requirement? What were the parameters of that requirement where you could establish some way objectively what was enough to satisfy getting something done? You're not going to become a mini-Commonwealth in two years. I can't imagine that that would be the case. It's just Commonwealth Edison over 100. That's not going to happen. So what is it in the directive and the certificate and the guidelines when the Commission granted this certificate that sets out the minimum parameters of enough? Frankly, Your Honor, I'm aware of nothing with the exception of the financing issue. And you agree there's a lot more than financing when you say are they making progress? I would certainly agree with that. So is your response hypothetically that perhaps if they could show in two years they now have the financing to start a major project that would satisfy enough? The question is show whom? Who do they have to show? Well, with respect to the financing, there is a requirement that this be demonstrated to the Commission staff. Is there any precedent for that? Again, I believe that this is an unusual case, and this is a good example of another aspect of its unusualness. But I'm not certain that the order speaks to either of your questions other than that. And again, I can't stand here today and tell you what the Commission will hypothetically do if the issue is ever squarely teed up before them in the event that somebody challenges the Rock Island's failure to exercise its certificate or the Commission takes its own action. Housing Council has suggested that perhaps just soil borings would be enough. What is your opinion on that? Again, with the understanding, Your Honor, that this is my opinion, I would expect more of a showing. I'm not sure the Commission necessarily would. Has the land been purchased in Shanahan for the construction of this facility? I do not believe so, but I'm not sure that's a matter of record. All right. And again, thank you very much, Your Honor. Thank you, Mr. Arnott. We appreciate your argument. And Mr. McBride. Good morning, Your Honors. May it please the Court, Owen McBride on behalf of Rock Island Cleanline. Can you just answer my questions quickly? Has the land been purchased in Shanahan? Rock Island owns an option on the land in Shanahan for the construction. How many acres? I don't know, but it's obviously sufficient for the structures that have to be built there. Do you have the money to exercise that option? Now, do you have the money to exercise that option? I don't know.  How many easements have been privately purchased from landowners over the 122 miles? A small number, but not a significant amount. Why so small? You've had a year. Well, the main reason that limited activity has occurred in Illinois is that this project also has to be approved by the Iowa Commission. And Rock Island elected to file first with the Illinois Commission and obtain a certificate and then go to the Iowa Commission. Why is the Iowa Commission necessary if you're crossing Illinois? Because the transmission line will start in O'Brien County, Iowa, in far northwest Iowa. Oh, you can't even get the power there to date? No, the transmission line will run a total of some 500 miles from northwest Iowa to Grundy County. Where is it coming from, the power? It will come from wind plants, wind farms that will be built by third parties in O'Brien County, Iowa. How many states is that power going to cross before it hits the Iowa-Illinois border? Well, the transmission line starts in Iowa. Is it there now? No, that's what we're seeking approval from now from the Iowa Commission for their authority comparable to the Illinois Commerce Commission. What happens if you don't get that over the course of the next year? I'm sorry? What happens if you don't get that over the course of the next year because the clock is ticking? Yes. Well, the question is about the statutory provision that a certificate, the provision says the authority granted by a certificate must be exercised within two years. How do you intend to do that? Well, let me just say that there's virtually no, I would venture to say, really no appellate case law on what it takes to satisfy, what is sufficient to satisfy that requirement and very few commission cases. So is your answer really going to be as little as possible? No, I think we're very mindful of the two-year provision and the fact that it would give opponents of our project the opportunity to say, well, you haven't done anything or you haven't done enough within these two years and so under the operation of the statute your certificate is void. So my client is focused that it will need to engage in more activities, frankly, than it has to date to move the project forward in Illinois to be able to have a, be able to demonstrate that it's satisfied that position. I feel that you're going to meet a lot of opposition. Maybe landowners won't give you easements voluntarily and that would end the project. Well, that would end the project unless eminent domain authority could be acquired. Isn't that really why you want to be a public utility so you can? No, we want to be a public utility because this is a public utility, because it would be unlawful to build a project like this, to deliver 15 million kilowatt hours a year of electricity across Illinois. How much is staying in Illinois? Well, that is up to the buyers of the power. Illinois buyers? Well, Rock Island is only the transmission provider. Rock Island is not selling the power. Are they Illinois buyers or are they investors on the East Coast? Oh, no. Well, the investors may put money into the construction of the project, but the customers of the transmission line will be either the generating plants in Iowa who want to move their power to Illinois so it can be sold to customers, or it will be purchasers. Their power, which is not being generated in Iowa. No, it is being generated in Iowa. It could be generated in, if you were to look at a map, this is the far northwest corner of Iowa, and we've actually identified 18 wind companies who are actively engaged in developing projects in O'Brien County and the surrounding seven or eight counties, close enough that they could use this facility. But because it is also close to the Nebraska and South Dakota borders, someone could build a wind farm very close to Iowa but actually in Nebraska. But that's the region. If you get too far away, then you have costs to bring your power to where Rock Island's line starts, so that becomes uneconomic. So the wind farms and the generators will be generally in this northwest Iowa area. The power will be transported by the transmission line that's delivered to the converter station in northwest Iowa. It will be transported across Iowa, across Illinois, to this converter station in Shanahan. Do you own options to build that anyplace else other than Shanahan? Yes. Based on the record, I can't tell you if it's expired, we also had an option in Kendall County in case for whatever reason the Shanahan... Do you have an option in any other state? No, not for this project. Now with this certificate, we are only authorized to build the project that we presented to the commission, and that includes a very specific route. There's a detailed legal description. So we don't have authority under this certificate order to move the end of the project to Indiana. Do you have authority not to build the facility in Shanahan and just build the transmission line? No, that's impossible. You have to go vote? Yes, because the specific technology, which is the optimum technology for this particular use, which is to move power 500 miles, requires that we have this converter station in Shanahan because the power on our transmission line is what's called direct current. The grid at large is alternating current, so this entire project can't function physically unless we build a converter station at the end of it at the point where we're going to deliver it into the existing grid. To serve? To serve customers in Illinois, customers in other states. That's the decision of the buyers of the power as to whether they are ultimately going to deliver it to end users in Illinois or end users in Indiana. As Mr. Harvey said, the specific electrons are fungible, but all the buyers will have end-use customers. Can I go back to your comment before you? Yes. You acknowledged that this is a novel issue and so there aren't any appellate cases on this. On this two-year point. On this two-year point. Yes. And the requirements and the standards of the two years and how much is enough to get done. You said there's a little in the commission. Well, what is there in the commission's rulings? I mean, is it the Amaran entity's case? No. The only cases I'm familiar with that I would say from time to time the commission initiates proceedings against entities that have been granted certificates and basically have not done anything. And sometimes those are resolved by the company demonstrating that it's done something. This more frequently, frankly, has come up in my experience in telecom cases and it's the competitive telecom providers that basically don't own any assets, don't have facilities, but provide service solely by leasing facilities from other existing telecom companies. And the issue there, in my experience, has typically been that you have not filed a tariff and have not started to provide service to the customers. So typically the company that's accused says, okay, well, our plans didn't work out and we're just withdrawing from the field. Or they say, you know, okay, we're now filing a tariff or we don't have a tariff but we're providing service through private contracts to customers and that's not visible to the commission, but they're able to demonstrate they're providing service. There's no prior case law on the dynamics and how the different sections of 406 are intertwined. Is that 406A a new application and then other requirements? Well, I will say this. We originally, in 2010, our original read of the statute was we had to get a certificate as a public utility before we could apply to actually build something. And so we, in 2010, Rock Island filed an application under 406A solely to be a public utility and the commission staff moved to dismiss our application based on the argument that you can't be a public utility unless you're going to build something. So, you know, they said our filing should be withdrawn or dismissed until such time as we were willing to come back, we could come back with an actual proposed project. A proposed project. Yes, so which is what this case is. So we actually, I'm not saying we agreed with them, but we basically, we did that. We withdrew that filing and we came back with this case where we're actually proposing to build a transmission line and asking for authority to do that. So, you know, in our context, we can't, we couldn't build, we couldn't start building a public utility facility until we had a certificate. That would be unlawful. We couldn't act as a public utility.  We couldn't sign up customers to a service that we weren't authorized to offer yet, which is one reason we have no customers in our contract. We didn't during the course of this case. We did exactly what the statute says you're supposed to do. We have a proposal to build a public utility project, a transmission line that will move millions of kilowatt hours of electricity and deliver it to the public in Illinois. And so we went to the commission. We laid out our plan. We've addressed this in detail in our briefs, but there's three findings that have been made, as you know, and substantial evidence supports each of the findings that the commission made. We're now authorized. We now have a certificate that says we're authorized to build this project and use it to provide public utility service. And, by the way, we're not authorized to provide any other public utility service. We're only authorized to operate as a public utility using the proposed facility and providing the service we described so that we've done exactly what the statute called for. You know, with regard to doing everything the statute requires, in many ways, what you're asking this court to do is, in giving deference to the commission, is interpreting the statute in such a way that's saying that whatever the commission would decide at the end of the two years is the right of the commission to decide without any other sort of guidelines, requirements, anything or, again, how much is enough? Well, first of all, I mean, with all due respect, you're asking about something that wasn't an issue before the commission, other than the fact that this provision is, at least inferentially if not explicitly, is telling you that you don't have to be ready to start providing your service the day after you get your certificate order. You have some period of time. You have two years to exercise that authority. So, I mean, again, there's very little law on what that requires. So you satisfy that, but at the end, you know, in two years, if people think that Rock Island has not engaged in sufficient activities to exercise the authority of the certificate, you know, then that will undoubtedly be a case before the commission. So your suggestion is the issue before us here is more narrow, about you don't have to be a utility to get a certificate to become a utility under 406A, and what happens in the future is for another day in another case. Yes, on that particular issue. Let me ask you about the procedure for that. Procedure? When the two years is up, do you file a report then to the staff? No. So this is one of the challenging aspects of this particular provision. It says that if authority granted by the certificate is not exercised in two years, the authority granted by the certificate is void. So you know the difference between void and voidable. One would say your certificate has expired by operation of law. No finding is required by the commission to say that. Now, obviously we're prognosticating. Rock Island is going to do things that it believes are sufficient to demonstrate that it exercised the authority of the certificate. Someone is likely to say, wait a minute, your certificate is void. That will probably result in a proceeding initially before the commission where parties will argue about has Rock Island exercised the authority of its certificate. But there's no automatic procedure in the statute or anything the commission has established that says you need to come in here, utility, at the end of two years and demonstrate that you've been doing sufficient activity that your certificate has not expired. Doesn't the order itself contain some of that language about financing? Well, that by its terms doesn't have a two-year limit or any limit on it, but it does require a filing with the commission, which is not at all an unusual requirement. The commission often imposes conditions in certificate orders, in orders where it's approving mergers and acquisitions, and other things it has to approve. And those, you know, by definition, those certificates either require the – those conditions either require the certificate recipient or the party whose merger has been approved or whatever to either do something after the order has been entered or refrain from doing something or demonstrate that it's meeting some standard. For example, it's a frequent case – condition in merger cases that the commission says you have to meet these service quality indices because the merger statute says that the commission can only approve a merger if it finds that it will not adversely impact service. But in this case, in this case, there is a specific requirement about financing. Yes, to make a filing. Not to obtain financing, but to file. Is that what you're saying? No, no. Well, it's – the filing is the documentation that financing has been obtained. All? Parts? No, all. And that's – I mean, this – I want to say that I think the focus of the condition is – I mean, the commission – the evidence showed that Rock Island is capable of financing the project using the approach it laid out, which is frequently using the industry. The commission said, okay, but we don't want you to start construction until you have obtained 100 percent of the financing needed. We don't want you to obtain 50 percent or 60 percent and start construction. We want you to obtain all of it. All right? And that's actually – to me, that's – I think that was actually a brilliant regulatory solution to the issues raised about ability to finance and concerns that, well, gee, what if they started billing it and they didn't finish it, and now some of us landowners have transmission poles on our property and so forth. So the commission said, you have to obtain 100 percent of the financing, file the documents, you know, whether they're loan agreements or financing commitments or, you know, equity agreements from the various investors and lenders, file that with the commission, serve all the parties – yes, the staff will review it, but any other party is also – would be entitled to file a complaint with the commission, file a petition with the commission to say, hey, we don't think they've, in fact, obtained all the financing. These documents are deficient, et cetera, et cetera. So no one's being denied the opportunity to challenge this if there's something to be challenged. But yes, it's 100 percent. It's 100 percent of the financing to cover the projected cost of the project. Once you file something, then the burden shifts to the opponents to stop. Yes, they would have – well, I can't say what they would have. The burden – I would say the burden to go forward. I'm not prepared to say the burden of proof, but they would need – and the staff will review it. And, I mean, the purpose of having the staff review it is that if the staff also thinks it's deficient, the staff files a report with the commission and asks the commission to initiate a formal proceeding to investigate whether the condition has been complied with or violated. And there's many commission proceedings that start that way based on staff requests for a formal proceeding. Iowa is, to me, is a little strange state. Here in Illinois, you get your certificate first. You try and acquire easements. If you're unable to do so, you have the ability to come back and ask for eminent domain. And the commission has a separate set of standards as to whether eminent domain can be granted for the remaining parcel. In Iowa, they seem to require you to go out and acquire the land and ask for eminent domain first and then present to the commission whether your project is needed and an appropriate transmission project. And you think that's strange? Well, it's just unusual in my experience. I mean, look at it this way. Why should you be before the commission arguing about getting eminent domain on someone's property when the commission hasn't even ruled that you have a project that meets the criteria under our statute for being a public utility project? So I don't represent Rock Island in the Iowa proceedings, but it's my understanding they've spent a considerable amount of time with the commission trying to come up with a procedure that will result in the commission first deciding if the project should get what we would call a certificate, whatever they call it there, and then addressing eminent domain if needed so it would be more consistent with the Illinois and most states' order of things. So there's a proceeding in progress that's been filed, and I would say it's moving forward, but slowly attempting to resolve this sort of threshold procedure. Any other questions? Thank you, Your Honor. Thank you, Mr. McBride. Mr. Rippey and everybody. Thank you, Your Honors. The court's questions have highlighted why Rock Island is not and cannot be a utility. It is not just technical catch-22. As Commonwealth Edison made clear in the briefs, our argument is not that you have to have experience before you can get the job to get experience. Our argument is that utilities, every one of them, either qualified when they applied or committed to qualify upon receiving the certificate. That is, they pledged that if they became a utility, and in most cases they were essentially ready to do it or ready to commence construction immediately, they would become a utility. Rock Island cannot begin to meet that criteria. Why? First, they pledge nothing. None of them wanted to talk about this for good reason. But the record is clear that even with the certificate in hand, Rock Island makes no pledge to ever serve anyone. To quote their president, from the record, the page references appendix at 842, if, quote, the project wasn't worth investing in any further, then we would abandon it, unquote. From their CFO, Mr. Berry, quote, Rock Island will not be able to proceed with the construction of the project in the absence of sufficient transmission capacity contracts to support the financing necessary to construct the project, unquote. That's the financing that they don't have. Neither of those things have happened. And unlike every other utility, including Ameren Transmission Company, they make no pledge to ever serve anyone. The commission has required them to have satisfactory financing for the proposed project within two years. Your Honor, I wish it was that clear. I don't think the financing condition has any time limit on it. I don't read the order that way with respect. Moreover, 8406B makes very clear, and the Adams County decision made clear, those are prerequisites to certification. It doesn't say you have to have the cash in the bank, but it does say you must be capable of financing. And the uncontroversial evidence was that they weren't. And the commission never made any finding that they were capable at the time the certificate was granted. What they did instead was say, in the absence of that showing, we're going to establish this future condition. Now... It's a future condition about financing. It is about financing. There is no other future condition, including all the other uncertainties that the Court talked about. Secondly, there is no pledge to ever, even if they build the line, serve a single or all-in-one customer, as Your Honor has made clear. We don't know who the customers are going to be. Those wind generators that were talked about do not exist. They are hypothetical hopes for future construction. Who is going to buy on the other end? We don't know. It could be wholesalers. It could be marketers. And that power is going to get sold to the highest bidder because even the 25% open season is an auction. This is not a utility that equally serves all eligible customers. It is an auction. Highest bidder wins. Everybody else is left without service. That's not serving the public. Now, with respect to Ameren in particular, I also want to point out that Ameren started by building one line. That line was built jointly as the Commission's order in docket number 010423. It's January 23, 2003. I'm sorry. It's 060179 in 2007. It makes it clear. It was going to be funded, constructed, and operated in conjunction with Ameren IP, an existing utility. And it committed to build the project to serve Illinois customers, which Rock Island does not. So we briefly talked about financing. However useful that condition is, it's a future condition, and it can't replace a statutory mandate. 8406B requires a showing of present capability, and there is none. This is not, I submit, the kind of case of first impression that warrants expanding, twisting, disregarding the plain language of the statute. How does the plain language of 406A relate to 406B? 406A, Your Honor, as I said, simply is the provision that simply authorizes the Commission to enable an entity that qualifies as a public utility to act as one. 406B is a project-specific certificate. So there's two kinds of certificates. One is to be a utility. The other is to build a thing, in this case, a transmission line and two HVDC converter stations. And what about 406F? 406F is the two-year exercise limitation. And the soil borings I was referring to was an old Commonwealth Edison Commission proceeding, which, as everyone says, there's no appellate law on this. But the last point I'd like to make is 846 has been amended numerous times, including an amendment signed into effect by Governor Rauner less than three months ago. There was every opportunity to go to the legislature and say merchants are special. You're right. They're not like any other utility because they're not like any other utility. Change the law. Has not happened. The law is, despite amendments, as it is. Are you conceding then by saying they're not like any other utility because they are a utility? No. They're not like any other applicant as a utility. Great point. No, they're not. They're not because they have no customers and never pledged to. And they say we don't listen. And never pledged to. Thank you very much. I urge you to reverse the order and send this matter back to the commission. Thank you. Thank you. Thank you all for your hard work today. Certainly a very interesting case. We will take this matter under advisement. We'll get back to you with a written disposition within a short time.